Mr. Ward. Thank you, Your Honor. Good morning, and may it please the Court. I'd like to take a look first at the three stages of this case which began over ten years ago. First, the early stage, when this case should have been remanded for lack of an existing arbitration agreement. Second, the confirmation stage, which we never should have reached, but by the time we got there, the same defect, lack of a valid existing arbitration agreement, was a ground for non-enforcement. And third, the dismissal stage, where the District Court denied Ukrnafta the chance to pursue justice by wrongly concluding that its state law claims were precluded by the arbitration. Early on, Ukrnafta argued that there was no arbitration agreement between it and CPC Delaware, the entity that sought to enforce it. The reason is very simple. The JAA amendment in 1998 that CPC Delaware relies on was signed by CPC Texas, a different entity that ceased to exist in July 1996. This is a paradigm existence challenge to the arbitration agreement. It says that no agreement was ever formed. That's an issue for courts. The District Court should have decided that issue. You didn't raise that until 15 months after arbitration had been initiated. Your Honor, this case began, Ukrnafta brought its claims in this case after the arbitration was initiated, 15 months into the arbitration, fall of 2008, is when Ukrnafta's position is when it became aware that CPC Delaware was not the same entity as CPC Texas, and that CPC Texas had ceased to exist prior to the execution of the 1998 JAA amendment. So, Ukrnafta, at that point, raised this as a defense to jurisdiction in the arbitration. In this litigation, this issue was signaled on the face of the removal petition, and it was raised almost immediately in a preliminary injunction motion that Ukrnafta brought immediately and then shortly after, after the District Court had stayed, it was raised again in a motion to remand, which the District Court struck and did not consider. On the face of the ... Well, you said the District Court, there's an existence issue, and the District Court should have decided the existence issue. It seems to me that's a concession that there was federal court jurisdiction, because how does a federal court decide if an arbitration agreement exists if it has no jurisdiction? I mean, that's a merits ruling. In Biser v. Weiler, the court looked at not an existence challenge, but it looked at a challenge to enforceability of the agreement against a particular party, and it says that on the face of the pleadings, if there are allegations of a non-frivolous claim that an arbitration agreement relates to it, that the court can look at that, can look at that. It also ... It goes on to say that we expect ... Right. And here, there's certainly a non-frivolous argument that the Delaware Corporation is still party to this arbitration agreement, and the Swedish arbitrators found that. So isn't that enough for this broad related to? Whether they're bound or not by the agreement, it does relate this dispute to an arbitration agreement, right? Judge Costa, in a minute, I'd like to address this about what the Swedish arbitrators found, which wasn't exactly that CPC Delaware was a party to the 1998 JAA amendment. I think you said it succeeded to it, but ... But, Biser says, on the face of the pleadings, you can consider certain underwriters at Lloyd's. There was an arbitration agreement. Now, there was an arbitration agreement. Now, you go in and you say, this is not the arbitration agreement that we are bound to, and it becomes a matter of enforcing that arbitration agreement, and that is for the arbitrator to determine. And you had jurisdiction under 205 to remove the jurisdiction to begin with, and the court always has jurisdiction to determine its jurisdiction. Judge Jolly, that's exactly right. The last part you said is exactly right. The court has jurisdiction to determine its jurisdiction, which is what I think Biser says, and certain underwriters at Lloyd's, a case that CPC Delaware cites in its briefing, goes on to say that it reads Biser as saying that the court should not initially remand if the face of the pleadings makes a non-frivolous, non-facially frivolous claim. But our challenge, Judge Jolly, is not an enforceability challenge, because it is that there is no arbitration agreement, because the arbitration agreement was signed in 1998 on behalf of CPC Texas, which ceased to exist in 1996. So you had a non-entity. There is an arbitration agreement. I mean, it's signed. I don't know. It's not maybe between Delaware and you. But there is an arbitration agreement that's been submitted to the federal court as I understand it. And it's removed on that basis, and the court has removal jurisdiction based on the arbitration agreement. Then you get the court and you say, this court does not—you can argue this court does not have jurisdiction, or you argue this arbitration agreement that has been submitted is not enforceable, because I'm not a party to it. And now that gets into the question of whether there's existence, formation, or enforceability. And it just seems to me an argument that's equally as significant in terms of enforceability as formation when you say—the court then says, well, I'll determine whether this contract is enforceable. I've got the arbitration agreement before me. The question, is it enforceable? You say it's not, because you say it doesn't exist. So the court says, that's an arbitrator's decision to decide whether this court is enforceable or not. And it just makes—there you go. But you can answer what I said and tell me why I'm wrong. Your Honor, I think there is a piece of paper with a purported arbitration agreement on it, which the district court had before it. That piece of paper was signed by a non-existent entity. There was—Ukrnafta signed it. Ukrnafta existed at the time. The other entity that signed it did not exist. It was a non-person. But the actual name on the agreement is the name of the company that does exist. The corporate—you're relying on the stamp—the wrong stamp. It's not. Well, Judge Costa, the removal petition itself attaches an English translation of the agreement, which does not have any signatures or seals on it. The Ukrainian language version of the agreement is the one that signed and sealed, which CPC-Delaware chose not to attach to its removal petition. Now, on the face of the removal petition, the removal petition, of course, was required to attach Ukrnafta's state court complaint petition. But I'm looking at the 1998 amendment. It says Karpatsky Petroleum Corporation. It doesn't say whether it's the Delaware or Texas— It doesn't specify. It doesn't specify. It certainly doesn't specify that it's Delaware. The seal on the Ukrainian language version—and CPC-Delaware tries to make a point that a seal doesn't matter if it's the wrong seal. But the seal on the Ukrainian version is the only thing that really identified which entity was purporting to sign this agreement. In an earlier amendment, the restated amendment, which was July 1996 is when CPC-Texas terminated. October 1996 is when there was a restated agreement, and that one says specifically, expressly, in the body of it, CPC—Karpatsky Petroleum Corporation—registered in Texas, USA. And that's on page 243 of the record, is one of the places that appears. So the 1998—by the time you got to the 1998 amendment, you were already following on from previous amendments that were signed, also using the CPC-Texas seal, and in at least one of those, expressly spelling out in the body—you know, you can have these claims in the state law case. The core operative fact is the deception regarding CPC-Texas. Okay. So if it is an issue for the court and not the Swedish arbitrators, I mean, the Born Arbitration Treatise says it's well settled that an entity that does not execute an arbitration agreement may become a party thereto by way of legal succession. It actually cites some Ukrainian cases for that, of all things, but why isn't that the law, that the court should apply if it's an issue? Well, for one thing, there was nothing for CPC-Delaware to succeed to because the 1998 CPC-Texas ceased to exist. You know, even if CPC-Delaware can succeed to things that CPC-Texas had— The 1998 was a nullity, is your— It was a nullity. It was a nullity. And the—you know, this case, I think we used the phrase in our brief a couple of times, this case went off the rails early because the court didn't look at this. And after the—simultaneously while the stay motion was brought in, while we had a preliminary injunction, because at the beginning, at the outset of this case, CPC-Delaware was on the verge of being sold to, I think, Kuwait Energy, which is now the owner and part of that urgency was that its trade secrets were going to be further disseminated. So there was a flurry at the beginning of this case where we had a preliminary injunction and argued there was no valid—no agreement existed because of this issue about the parties. And then, you know, the response was moving to stay. The court stayed the case. It went to—meanwhile, in Sweden, there was a jurisdictional proceeding in the arbitration. And the arbitral panel—the arbitral panel did not rest its jurisdiction on a finding that there was a 1998 existing amendment. It said, by Ukernafta's conduct in this arbitration, you have consented to continue in this arbitration. Did your client agree to the transfer of their arbitration from Ukraine to Sweden? Not with CPC-Delaware, because we had no agreement with them. But the original—and I'd like to talk a little bit about the primary jurisdiction issue. The 1995 original JAA, of course, had a Ukrainian arbitration clause. And that's—you know, that's the only relevant agreement that there's no dispute here that that was a valid existing agreement between CPC-Texas and Ukernafta. The 1996—October 1996 restatement of the JAA, this was signed on behalf of CPC-Texas after it had ceased to exist in July 1996, but it was purportedly signed on CPC-Texas. We dispute that that is valid and that's existing. But it was when CPC-Delaware was the real entity, that continued a Ukrainian arbitration clause. Even the 1998 JAA amendment, the same paragraph that adds the Swedish arbitration clause, that same paragraph continues to talk about Ukrainian material law applying to disputes. And I would submit, you know, we think based on, you know, based on the arbitration clauses that talked about Ukraine arbitration, and also we think that that's part of what qualifies Ukraine as a primary jurisdiction, the Karaha-Bodas case at least recognized that there might in some cases be more than one primary jurisdiction. But I would also submit that while material law is distinct from arbitration procedural law, in this case the issues are intertwined. Under Ukrainian law did this agreement form a contract, and that's a disputed issue. All right. You've saved time for rebuttal. Thank you, Your Honors. Mr. Cronin? What is the significance of his argument that the arbitration agreements submitted to the legislature that was removed, on the basis of the removal, was itself a nullity and was never in existence itself? Right. So for purposes of jurisdiction, Your Honors, under Biser the law is very clear that what matters is— What did he say about that, though, that it was a nullity, his argument that it was a nullity and there was no—there was certainly no agreement because of Delaware, but then there was no agreement earlier because the 1994 agreement, I believe he said, was a nullity itself. The notice of removal alleged that this was not a nullity. It alleged that Karpatsky Delaware was the contracting party whose president signed this agreement in 98. So under Biser that is more than sufficient for federal jurisdiction. Now there is a separate question, which is an issue that, as I read their briefs, they haven't even raised, which is once the district court found that it had jurisdiction, did it correctly grant a stay of proceedings pending the arbitration in Sweden? You know, they haven't argued that because that is a merits issue about the stay order. It's not anything that has to do with jurisdiction. So whatever the district court did with the stay, it could not have deprived the district court of federal jurisdiction over this case. But even if this court were inclined to go beyond what they'd argued and look into the district court's 2009 stay order, they're still not entitled to any relief on appeal because they can't show any prejudice from that order. And the reason is, even if the district court was required to conclusively decide whether this 98 agreement was a valid existing agreement at the time, the fact remains that the court ultimately did decide that issue. That's the precise issue the court decided in 2017 in connection with confirming the award. And there's simply no prejudice whatsoever from the fact that the court decided the issue at that point in time rather than back in 2009, as they claim. As the district court found, there's two reasons why this 98 agreement is a valid arbitration agreement. The first is, under governing Swedish law, the Swedish courts have already looked at this issue and concluded, quite correctly, that what UKERNAFTA is doing here is trying to rely on a corporate technicality to avoid paying a presumptively valid arbitral award. The Swedish courts directly addressed this issue, and under governing Swedish law, held that the fact that there may have been a discrepancy over the state of this entity's incorporation at the time the parties entered into that contract is not a basis for challenging the validity of that agreement as a matter of Swedish law. Now, UKERNAFTA will point out that that was just the first instance district court in Sweden, and when the Court of Appeals in Sweden looked at the issue, it only relied on the forfeiture ground. But the fact remains that district court's decision is the only evidence in the record, under Swedish law, about whether this 98 agreement is a nullity or is a valid existing agreement. And that sole evidence of Swedish law comes down squarely in our favor. The second issue the Swedish courts, both courts relied on, is the forfeiture point. To your point, Judge Smith, the first time they raised this issue was 15 months into the arbitration, and that is despite the fact that the request for arbitration stated on the face of the document that Karpatsky was a Delaware corporation. Now they've claimed today that, well, that didn't necessarily mean it was a different entity. How could we have known that? But under the arbitral rules and under Swedish law, the standard is not what did you actually know, but what should you reasonably have known based on a reasonable investigation, and what the Swedish court of appeals quite properly concluded is that having thought all these years they were dealing with a Texas company, and then having received in the mail a request for arbitration that says on its face that it is being brought by Karpatsky Petroleum Corporation, Delaware, United States, that should have set off an alarm bell. It should have caused them to make a minimal inquiry to see if this was the same entity as the Texas company they thought they were dealing with, or if it was a different Karpatsky entity incorporated in Delaware. And they never did that. And that failure to undertake a reasonable investigation is why the Swedish court of appeals reasonably and quite properly concluded that this was simply raised too late. Under the arbitration rules in Stockholm, any challenge to the jurisdiction of the arbitrators had to be raised in the statement of defense, and they didn't do that here, and they didn't have a good excuse for not doing that here, because they had in their own hands more than they should have inspired them to make a reasonable investigation into whether this company was the same as Karpatsky Texas or different from Karpatsky Texas, and they just never did that. And that's what the court held quite properly when it confirmed the award in 2017, but to go back to the opposing counsel's point, there's simply no reason why that court would not have reached the exact same conclusion had it reached these issues in 2009, and so there's no prejudice from whatever the district court did at the time. And that's for a couple— In fact, their argument that this 98 Amendment was a nullity, that it never went into existence, does that all depend on the stamp? Because, I mean, the person who signed it was also the president of the Delaware entity, right? Indeed. And the company listed is the name. It doesn't specify Texas or Delaware. Quite correct. So it's all about the stamp? I mean, in their view, that's what I understand the argument to be, but— What's the significance of a stamp in corporate law, or just arbitration law, in terms of the validity of an agreement? So under Delaware law, there's no significance, and Delaware has cases directly on point where people have stamped agreements with the wrong stamp, and the Delaware Supreme Court has said it doesn't matter. Swedish law, same thing, that this was the exact same argument made to the Swedish courts, and they said the use of the wrong stamp doesn't matter, and the reason— Does the stamp require them? I mean, there must be a reason people stamp them. I, you know, there's a long-standing history of corporate seals, but I, the law is very clear, and it's cited in our briefs, that under Delaware law and under Swedish law, the fact that Mr. Texas was using the wrong stamp to stamp these agreements just doesn't make a difference. That's not, you know, you can look at it from the Delaware perspective, which says that the stamp just doesn't matter, or you can look at it from the Swedish district courts perspective, which is that this entire issue about whether it was an entity based in Delaware or in Texas when he signed the agreement, because that is not a substantively significant fact that could reasonably have been expected to inform the party's decision to enter into this agreement. It's just not a valid basis for challenging the existence of the agreement under Swedish law. What would have been the conclusion if he had timely raised the Delaware discrepancy? In the arbitration? Initially. Right, so then there wouldn't be a forfeiture issue, but under Swedish law, that still would not have changed the outcome, because the Swedish district court concluded that even if this issue had been timely raised, it's just not a valid basis for challenging the existence of the agreement under Swedish law, because it's a corporate technicality. I mean, I, I, this is not an esoteric foreign principle of Swedish law the court relied on. What, what the court said is that what they're complaining about just is an insignificant issue that no reasonable contracting parties in this circumstance would have attached any matter of sheer common sense. It's just hard to argue with what the Swedish court saw there, but the Swedish, the fact that the Swedish court of appeals, they didn't, they didn't use that rationale, right? Does that, how does that affect things? It doesn't, because we're not relying on the Swedish district court decision for some sort of preclusive effect here, just for what the law is, just for what the law is exactly. And it is the only law on the record. You know, they had 10 years to put in expert evidence of Swedish law and get some expert to come say that the Swedish district court got it wrong and they never did that. And so as the record stands, that is the only evidence of Swedish law in the record on that issue of existence. On the, even apart from the Swedish court's holding that this was a valid agreement, there's also the, the issue of forfeiture and, and that also would have come out the same way even if the district court had relied on that back in 2009. What they've claimed in their briefs is that maybe they would have got a different result back then because by not raising this argument in the jurisdiction, in, in the arbitration, they claim that only forfeited their objection with respect to the claims in the arbitration and not the separate state law claims they want to bring here. But that's wrong for a couple reasons. One is that all the state law claims they're alleging here arise out of the same change of domicile, they arrange out of the same, they arise out of the same contractual relationship between the parties. These are all compulsory counterclaims. And so these are claims that can and should have been raised in the arbitration along with anything else. And if they have forfeited their objection to that tribunal's jurisdiction to decide this dispute, then absolutely that extends to these state law claims as well. But even if the court doesn't agree with that, with respect to at least some of the state law claims, they were absolutely at issue in the arbitration. And just to take one example, one of their supposedly distinct state law claims is a claim for declaratory judgment over the invalidity or validity of the 98 Agreement. And that was front and center in the arbitration. The tribunal spent more than 20 pages addressing that specific issue. So clearly at least some of these claims were subject to a stay pending arbitration. And as this Court made clear in the Sibley case that we filed last week, as long as some of the claims are subject to arbitration, a district court is well within its authority to enter a stay, wait for the outcome of the arbitration on the claims that are going to be arbitrated there, and then decide at that point whether to confirm the award and whether to rule on the preclusive effects of that award with respect to the remaining claims. And that's exactly what happened here. And if that's not enough, there is yet another reason, Your Honors, why there's simply no prejudice from the district court's 2009 stay order, and that's this. Even if the district court had denied a stay and sent this case back to State court, the arbitration in Sweden still would have gone ahead. The award still would have come out a year later in 2010. And as soon as that award came out in 2010, that would have given us a separate and independent basis to remove the case right back to Federal court. Because under Section 205, you can remove either based on the agreement or you can remove based on the award. So as soon as, even if we get remanded, as soon as the award comes down, we're back in Federal court. And then we would have said, district court, now we have an award. We want it confirmed. And then we want you to decide whether the preclusive effects of this award preclude the state law claims or not. So even if the court had denied a stay, we would have ended up in the exact same place, with the district court deciding whether to confirm the award and whether the preclusive effects of the award preclude the state law claims that ECRNAFTA wants to bring. So they, you know, they are trying to undo 10 years' worth of litigation based on this claim, and maybe they're entitled to make that attempt, but they aren't allowed to undo 10 years' worth of litigation unless they can show that something that happened in 2009 actually affected the outcome of the case. And they haven't done that. And so this entire first stage of the proceedings that they want to challenge just is not relevant to what happened at the end of the day in this case. Now, I do want to turn to the issues of conclusion, which are also important. As the district court explained, the tribunal found that ECRNAFTA simply suffered no harm from Karpatsky's change in domicile. And that finding precludes all of ECRNAFTA's claims, with the possible exception of unjust enrichment. The tribunal also held that Karpatsky Delaware succeeded to Karpatsky Texas' rights as a result of the merger. And that finding precludes the trade secret and unjust enrichment claims. With respect to the first of those rulings, the tribunal's finding of no harm was conceivably an alternative holding. So this court does need to decide whether its decision in Hicks v. Quaker Oats should be extended beyond the context of offensive collateral estoppel to the context of defensive collateral estoppel. And it should not extend that case. And the reason is Hicks relied on the special problems of offensive collateral estoppel, the possibility of unforeseen plaintiffs and unforeseen liabilities, which, in this court's view, raise special concerns about granting preclusive effects to alternative holdings. Outside that context, the rationales for the traditional rule remain compelling. It simply doesn't make sense to deny a judgment preclusive effects just because a party's arguments were so bad that they failed on multiple independent grounds. And on this point, I would invite— I have a question about the preclusion. If, in the arbitration issues, we were hypothetically to decide that the Delaware entity and the Texas entity have the same rights and they succeeded to the same agreements, there's no material difference, basically your view on this issue about whether there's any significance to this stamp, wouldn't that, apart from preclusion, just our ruling on those issues end most of the state—most, if not all, of the state law claims? Almost as a law of the case, or it would just—I mean, in other words, they would still have the rights to their trade secrets, everything else, if we say there's no difference between the Delaware and Texas entities. I mean, it's a little tricky. So the motions that were in front of the trial court were a motion to confirm the award. And so some of these issues might be traversed in that context, but they would be under the very limited framework of the New York Convention for Opposing Recognition. And then we also moved for summary judgment based on the preclusive effects of the tribunal's findings. Certainly, if for some reason the Court doesn't agree with those two arguments, then there may be issues on remand about whether we're nonetheless entitled to summary judgment just because the underlying evidence, plus perhaps any findings this Court makes, you know, precludes them from establishing their claims just based on the summary judgment record. But I'm saying, I mean, that most of their state law claims hinge on the Delaware company not having trade secret rights and things like that. It depends. So the fraud and the negligent misrepresentation claims, I think, go a notch beyond that because there, the argument is that's, you know, not just that— They pledge you about what happened. Exactly. Yeah. But that, you know, all the claims, again, with the possible exception of unjust enrichment, do require them to show harm. And that's just something the tribunal flatly held they didn't suffer and couldn't show. And it was an alternative holding, but that alternative holdings we submit do have preclusive effects in the context of defensive collateral estoppel. And on that, too, I just wanted to point out that earlier this year in Wyoming v. Herrera at the Supreme Court, Justice Alito delivered an opinion that addressed this issue at some length and, I think, very persuasively. So if the Court hasn't read that opinion yet, I would certainly commend it to the Court's attention. So if it, looking at claim preclusion instead of issue preclusion, is it a problem that, you know, these, you're saying they should have brought these as counterclaims in the arbitration because you brought the arbitration. Right. And doesn't that usually require looking at what the rules are in that tribunal about compulsory counterclaims and things like that? I'm not sure we have all that in front of us. Right. So the parties have not argued a choice of law issue on preclusion. And as I read this Court's precedents, in that situation, if neither party argues choice of law, then the Court justifies forum law. So that's why, for example, on the issue preclusion thing, even though, you know, I can imagine an argument that some other jurisdiction's law should apply to that, both parties have just argued it on the basis of Hicks and on the basis of this Court's preclusion precedents. And so in those circumstances, this Court can and should just decide the question under forum law governing preclusion. And so for issue preclusion, that, you know, that leads to the conclusion we advocate. And same thing under claim preclusion. The standard that both parties have argued this on is under Fifth Circuit principles of does this arise out of the same common nucleus of operative facts. Neither party argued that Swedish law, for example, invokes a different standard. Under this Court's cases, clearly these claims do arise out of the same nucleus of operative facts because they arise out of the same contractual relationship between the parties. So wholly apart from the issue preclusion that the District Court addressed, claim preclusion principles independently are a reason why the District Court would have been required to rule in our favor on these preclusion issues. All of these are claims that do arise out of the same nucleus of operative facts. They all arise out of the relationship between the parties on these contracts and the change of domicile that was front and center in the arbitration. So there's simply no reason why... But your arbitration demand really had nothing to do with that. I mean, you filed the arbitration saying you, you know, defrauded us of investment opportunities, essentially. You crowded us out. It's only later through all these procedural issues that this issue about the contract in Delaware and Texas arises. Even the claim for arbitration, Your Honor, was based on the parties' rights and obligations under the 1998 Joint Executive Order. Sure. That's what gave you the right to the interest. Sure. And all the state law claims, they want to allege, arise out of that same contractual relationship. Their claim is you defrauded us when you lied about who you were when you signed that agreement. We gave you a bunch of trade secrets pursuant to that agreement that you then went and gave to this newfangled Delaware entity. All those claims are based on the same contractual relationship. And as this Court held in the Beaudoin case, claims that arise out of the same contractual relationship do arise out of the same nucleus of operative facts for purposes of claim preclusion. And so, you know, if the Court affirms the District Court's findings on issue preclusion, you don't even reach those issues because the issue preclusion arguments don't depend on whether there's a common nucleus or not. But if the Court wants to go beyond the District Court's ruling and look at the claim preclusion arguments instead, on this record we think it's very clear that these are claims that can and should have been brought in the arbitration, and because they weren't, at this point ten have been precluded. Unless Your Honors have any further questions? All right. Thank you, Mr. Cronin. Thank you. Ward for rebuttal. Thank you, Your Honors. There's a lot to go through here. Let me try to hit these points. On the issue of the key issue, or the issue of whether the stamp is what makes the difference on the agreements, number one, on the 1998 amendment, the stamp, the seal, is the only thing on that agreement that specifies which entity we're talking about. The 1998 agreement also followed the October 1996 purported restated agreement. Again, we don't think that agreement was properly formed because it was in July 1996 that CPC Texas ceased to exist, but that agreement, not only the corporate seal, but the body of the agreement on the very first page refers to CPC registered in Texas, USA, and both of these were signed by the then president of CPC, the enviably named Mr. Texas. I don't know, but I don't think his name is related to the original registration, but the mere fact that he happened to be the person authorized to sign for CPC Delaware does not change the fact that what's reflected on the document is that he was signing on behalf of CPC Texas. This is also related to this issue of inquiry notice in the arbitration. Our objection in the arbitration was not merely, not simply that it was CPC Delaware and we didn't know you were in Delaware. Our contention there, as here, is that UCANAFTA did not know that these were two separate entities, one of which had ceased to exist. Throughout CPC Delaware's briefing, it repeatedly refers to CPC's change of domicile. That's a question-begging formulation, and CPC Delaware conceded in the arbitration that this was not a mere change of domicile of the same corporate entity. CPC Delaware was newly created. CPC Texas merged into CPC Delaware and ceased to exist. So there were two different entities, one of which ceased to exist in July 1996, and when we talk about inquiry notice that we should have at least been on inquiry notice earlier, among our allegations and our pleadings, and we've argued it several times, is that in 2006, in 2006, UCANAFTA requested clarity, requested clarity on, you know, what's the deal with CPC Delaware? What's your corporate status? You know, that would have been the time, if they hadn't have done it before, which they should have, since that's ten years after the fact, come clean about the fact that CPC Texas ceased to exist and CPC Delaware was a new entity. In 2006, CPC Delaware, Robert Bench, was then the president of CPC Delaware, sent UCANAFTA CPC Texas corporate registration documents. So inquiries were made, inquiries were made. Your Honor, to this, under Swedish law, or the Swedish arbitrators' decision, this would have made no difference. Even if you had raised this matter timely, it would have made no difference because they paid no attention to a mere change of corporation, corporate names. Well, Your Honor, this, this, this was not, though, a mere change of corporate names. It was a change of corporate entities. Do you have any argument that your client was prejudiced in any way by UCANAFTA v. Texas? Well, you know, for one thing, I mean, we were prejudiced by the fact that this case was stayed ten years ago and we weren't allowed to proceed. At the early stage in the case . . . On the merits, does it affect any way the dispute, the substantive dispute between the parties? Um, as, as to UCANAFTA's state law claims or as to the claims about the . . . I guess any of it. Yeah. I mean, I understand your state law claims are based on it being an unauthorized entity, but . . . Well, I think, you know, you know, part, part of the prejudice here from this not being decided earlier is we put on evidence at the outset that under Ukrainian law, the, the arbitration agreement didn't exist. The, the Swedish district court decision, which, as we pointed out, was not the last word by the Swedish courts on the subject, that they rely on, you know, that came years later. So they had no evidence that Swedish law, um, um, recognized this arbitration agreement. And they still don't really because the Swedish court of appeal that had the last word said we're going by this, you've conceded by your conduct in the arbitration. All right. Thank you, Mr. Ward. Your case is under submission. Thank you, Your Honors. Last case for today, Inclusive Communities Project, Incorporated v. Department of Treasury.